IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

| | | |
|---|---|---|
| ANGELA R. GARRICK, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | No. 5:10CV00292 SWW |
| | * | |
| JOHN MCHUGH, Secretary, | * | |
| Department of the Army, | * | |
| | * | |
| Defendant. | * | |

**Memorandum Opinion and Order**

Before the Court is a motion to dismiss or, in the alternative, motion for summary judgment filed by John McHugh, the Secretary of the Army. Plaintiff responded to the motion and Secretary McHugh filed a reply. Plaintiff filed a response to the reply.[1] Having carefully considered the motion, responses, reply, briefs, statements of facts, exhibits, and affidavits, the Court finds the motion for summary judgment should be granted.

**Background**

Plaintiff Angela R. Garrick ("Garrick") was hired in April 2003 as a Toxic Material Handler ("TMH") by the Department of the Army ("Army") to work at the Pine Bluff Chemical Activity ("PBCA") at the Pine Bluff Arsenal. Some of the major duties of a TMH are "receiving, storing, warehousing, pressure testing, leak testing, transferring, shipping, care and preservation, and demilitarization of a variety of toxic agents including both lethal and non-lethal, persistent and non-persistent types, stored in ton containers  55 gallon drums, rockets, and other type munitions."

---

[1]Defendant filed his motion to dismiss/summary judgment on January 14, 2011. After seeking and receiving a number of extensions, plaintiff filed her response on March 31, 2011. Defendant filed a reply on May 9, 2011, and plaintiff filed a response to the reply on May 18, 2011.

Def's.' Mem. of Law in Supp. Mot. Dismiss/Summ. J., Ex. 1 at 2. Others duties include "care and preservation of incendiary, smoke, toxic and explosive type munitions and auxiliary equipment." *Id*.

As a condition of her employment as a TMH, Garrick was required to remain enrolled in the Chemical Personnel Reliability Program ("CPRP"), which is part of the Army Chemical Surety Program. The Army Chemical Surety Program's purpose is the "safe and secure acquisition, storage, handling, maintenance, transportation, inventory management, and disposal of chemical surety material." *Id.*, Ex. 2 at ¶ 1-5a(5). The CPRP is "a tool for commanders/directors to make risk-based assessment decisions to ensure that persons with access to chemical surety material meet high standards of reliability." *Id.* at ¶ 2-1a. Among the CPRP's functions is "screening, evaluating, and certifying individuals for the CPRP . . . [and c]ontinuing evaluation in the form of periodic reinvestigations (Prs), drug tests, and evaluation by supervisors, fellow workers, certifying officials, and support agency personnel . . ." *Id*. at ¶ 2-1(a)(3)(-(a)(4). Disqualifying factors for the CPRP include "[i]nappropriate attitude, conduct, or behavior," which is manifested through "[p]oor attitude or lack of motivation . . . [such as] arrogance, inflexibility, suspiciousness, hostility, flippancy toward CPRP responsibilities, and extreme moods, or mood swings." *Id.* at ¶ 2-8(d). Other factors include "aggressive/threatening behaviour toward other individuals" and "negligence or delinquence in the performanace of duties." *Id*.

In March 2007, the Army promoted Garrick to the position of TMH Leader. Her supervisor was Harvest Lambert, supervisor of the Storage Branch of the Chemical Material Management Division. Her second line supervisor was Russell L. Bass, Chief of the Chemical Material Management Division of the Directorate of Chemical Mission Operations. Her third line supervisor was Charles K. Dunemn, the Director of the Directorate of Chemical Mission Operations of the PBCA. Garrick received two annual job evaluations from March 2007 to February 2009, and her

overall performance was excellent. However, between June 2007 and April 2009, Garrick was cited 36 times for Standard Operating Procedure ("SOP") violations, twice the number of violations as any other TMH Leader. *Id.*, Ex. 4b at 136; Ex. 5. The violations were noted by eight different inspectors, including a female inspector. *Id.*, Ex. 5. Garrick testified that she corrected on site 15 out of the 36 violations listed, and said that a lot of the violations were "based on personal opinion." *Id.,* Ex. 4a at 50. According to Dunemn, while Garrick was a TMH Leader, her supervisor verbally counseled her on numerous occasions. *Id.*, Ex. 6, ¶2.d.

In July 2008, Lambert issued Garrick a written counseling statement noting she had problems "following SOPs, maintaining equipment, and performing mission as required." *Id.,* Ex. 7. The memorandum noted Garrick "must improve in these areas in order to be rated successful." *Id.* Lambert testified that he pulled Garrick from the Leader position for about a month because she was not following SOPs. *Id.*, Ex. 4b at 228-29. Lambert testified that Garrick's performance did not improve after the written counseling and other discipline, and that he recommended she be given a rating of "poor" or "fair" for 2008-09. However, his proposed rating was changed to "successful" by Bass, who told Lambert he was "going to change [the rating] because [he was] going to have a big talk with Angela [Garrick]." *Id* at 228.

Bass died in March 2009 and John Efurd took over his duties. In March 2009, Inspector Lou Ann McPherson was assigned to do quality control at Garrick's site. *Id.*, Ex. 3 at 105. McPherson told Dunemn, Efurd's supervisor, that Garrick told her that she should not be on the site to inspect Garrick's team. *Id.* Dunemn testified that on April 6, 2009, McPherson and Efurd told him that Garrick again had been cited for failing to wear protective clothing and other SOP violations. Dunemn responded by asking Efurd to gather all surveillance inspector comments made about Garrick during her career as a TMH Leader. *Id* at 105-06. Dunemn testified that when he saw the

list he "was somewhat shocked . . at the . . sheer volume of them." *Id.* Ex. 4 at 136. He said: "The findings on her are double any other supervisor that we've got out there, any other lead." *Id*.

The next day, April 7, 2009, Dunemn spoke with Efurd, McPherson, and Lambert to discuss Garrick's violation record. They commented that Garrick "was just not following SOP's, and was moving too fast in an unsafe manner." *Id*., Ex. 3 at 106. Dunemn concluded that Garrick should be demoted from the leadership position. *Id*, Ex. 4b at 136-37; 164. Two days later, on April 9, 2009, Garrick contacted a counselor at the Equal Employment Opportunity Office ("EEO") and designated Dunemn as the responsible management official. *Id.*, Ex. 8. On April 13, 2009, Dunemn met with Garrick and notified her that he was suspending her from the CPRP based on the number of SOP violations for which she had been cited. He said the meeting lasted several hours and Garrick denied responsibility for the SOP violations. *Id*., Ex. 3 at 108-09; Ex. 9. Dunemn testified that on April 14, 2009, he contacted Garrick's union representative, Cliff Fowler, to inform him of his intention to demote Garrick. Fowler suggested a reprimand rather than a demotion, and also suggested that Dunemn talk to Garrick's crew to determine their opinions of her as a team leader. *Id*, Ex. 4b at 140-41. Dunemn decided to survey employees by asking them questions about the things for which Garrick was being accused by the investigators. *Id*.

The results of the survey were overwhelmingly negative toward Garrick. All of Garrick's crew had observed violations by Garrick and many described her as rushed and having major communication problems with her team. *Id*., Ex. 10 at 122-134. In spite of the negative survey, Dunemn testified he was willing to reduce the contemplated demotion to a reprimand if Garrick would agree to accept responsibility for the SOP violations, agree to follow SOPs, and stop rushing operations. *Id*., Ex. 3 at 111-12. Dunemn met with Garrick again on April 29, 2009, but she refused to accept any responsibility for the violations but admitted she had not worn protective clothing or

hearing protection on occasion. Dunemn proposed that he would re-write the reprimand to include only those violations Garrick agreed she committed. *Id.* at 112-13. Garrick said she would come back that afternoon. Garrick says she contacted David Evans, an EEO manager, because she was concerned about the proposed letter of reprimand. She says Evans told her she should sign the letter and include a statement that she does not agree with it. When Garrick came back to see Dunemn that afternoon, she "signed that letter of reprimand but wrote a statement beneath her signature stating, 'However, I do not concur per David Evans.'" Compl. at ¶ 16. Dunemn testified that he believed this demonstrated a lack of leadership skills on Garrick's part: "[S]he accepted responsibility for nothing. . . . And one (1) last time I told her that, you know, as a leader she has to be responsible." Def's. Mem. in Supp. of Mot. Dismiss/Summ. J., Ex. 3 at 113.

On May 11, 2009, Garrick filed a formal complaint of gender discrimination and retaliation as to her suspension from the CPRP and the decision by Dunemn to conduct a survey of her crew. Dunemn testified he made one last attempt on or about May 21, 2009, to get Garrick to take responsibility for her SOP violations but she refused. *Id* at 113-14. On July 28, 2009, Dunemn proposed Garrick's demotion from the Leader position to a non-leader TMH position. He lifted her suspension from the CPRP and allowed her to resume work as a TMH. *Id.*, Ex. 6. On August 16, 2009, Garrick submitted her reply to the proposed demotion, and on August 17, 2009, she amended her formal EEO complaint to include Dunemn's proposal that she be demoted. Compl., Ex. B. On September 21, 2009, Steven Lowery, Civilian Executive Agent for PBCA , made the decision to demote Garrick based upon Dunemn's proposal. Def's. Mem. in Supp. Mot. Dismiss/Summ. J, Ex. 11. Garrick initiated an informal complaint of discrimination over her demotion on September 23, 2009, *id.*, Ex. 12. On October 20, 2009, she filed a formal complaint of gender discrimination and retaliation.

Dunemn released Garrick to perform CPRP non-leader chemical agent duties on July 29, 2009. On September 29, 2009, she was working under the leadership of Ricky Haynes. Haynes asked her to remove some items using a forklift and handed Garrick the keys. *Id.*, Ex. 3 at 33-34. When Garrick was finished with the forklift, Haynes asked her to return the keys. According to Garrick, Haynes motioned to her to throw the keys to him. *Id.* at 34-5. According to Haynes, Garrick responded by throwing the keys "over handed as hard as she could at me and stood there looking at me with a major attitude." *Id.*, Ex. 13. Garrick testified that she is a serious softball player and she can throw a ball overhanded about sixty miles an hour. *Id.*, Ex. 3 at 86-8. Garrick maintains that she threw the keys underhanded to Haynes but says she guesses "it was a lot harder than what he thought." *Id.* at 35. Garrick said Haynes threw his clipboard up and blocked the keys and after the throw Haynes stared at her and she "stared right back at hm for a little while." *Id.*

Haynes stated that the throw was so hard he had to block the keys with his clipboard, *id*, Ex. 14 at 2), and the keys left an indentation in the paperwork on the clipboard. *Id.*, Ex. 3 at 239-40. Six employees who witnessed the incident provided statements to Dunemn. They all said Garrick threw the keys at Haynes; five of them said Garrick threw the keys hard. *Id.* at 119-21; Ex. 14. Because Dunemn considered Garrick's throwing of the keys an act of violence based on the witness statements, he immediately suspended her from the CPRP. *Id.*, Ex. 3 at 119; Ex. 15. He also recommended to the Activity Commander, Lieutenant Colonel ("LTC") Farmer, that Garrick be permanently disqualified from the CPRP based upon this incident, her previous poor performance, and lack of accountability. *Id.*, Ex. 16.

On October 7, 2009, Dunemn presented to Garrick the CPRP suspension memorandum and recommendation for permanent disqualification, and gave her five days to provide a written response. Garrick provided a one-page response on October 15, 2009. She said that she was never informed

of the specific allegations supporting Dunemn's recommendation but then proceeded to give her version of the key-throwing incident with Haynes. *Id*, Ex. 17.

Garrick's statement and the witness statements, along with Dunemn's recommendation that Garrick be permanently disqualified from the CPRP were provided to LTC Farmer on October 16, 2009. *Id.*, Ex. 18. Dunemn's recommendation stated: "Based on her recorded history of safety violations, lack of accountability, refusal to change, and aggressive behavior, I have determined that the individual does not meet the reliability standards to remain in the CPRP." *Id.* On October 20. 2009, Farmer issued a decision accepting Dunemn's recommendation and disqualifying Garrick from the CPRP. *Id.*, Ex. 19.

As a result of her disqualification from the CPRP, Garrick was removed from the TMH position and federal service by Lowery in a decision dated December 14, 2009, because enrollment in the CPRP was a condition of her employment as a TMH. *Id.*, Ex. 20. On November 16, 2009, Garrick filed a formal EEO complaint alleging gender discrimination and retaliation over her disqualification from the CPRP, and amended that complaint on January 5, 2010, to allege that her removal from federal service was also based upon gender discrimination and retaliation. Compl., Exs. H-J.

Two separate all-day fact finding conferences were held to investigate Garrick's discrimination and retaliation complaints, one on September 10, 2009, and another on March 16, 2010. Def's. Mem. in Support of Mot. Dismiss/Summ. J., Exs. 3 & 4. During the conferences, twelve different witnesses supplied sworn testimony. Both Garrick and Dunemn testified at length. The combined transcripts totaled over 600 pages. *Id.* On August 27, 2010, the Army issued a final decision finding no discrimination or retaliation as to the demotion and removal. *Id.*, Ex. 21. Garrick filed a lawsuit in federal court on September 28, 2010.

Garrick alleges in Count I of her complaint that the Army suspended her from performing her CPRP duties from April 13, 2009, to July 28, 2009, because of her gender and in retaliation for her EEO activity in April and May of 2009, and demoted her from her position as TMH Leader beginning on October 11, 2009, until January 4, 2010, in retaliation for engaging in EEO activity from April 2009 to September 2009.  In Count II, Garrick alleges the Army terminated her from her TMH position and from federal employment on January 4, 2010, because of her gender and in retaliation for EEO activity she engaged in from April 2009 to November 2009.

Defendant moves for dismissal for failure to state a claim or, in the alternative, for summary judgment under Fed.R.Civ.P. 56.  Because the parties present matters outside the pleadings, and the Court relies upon those matters, the Court will consider defendant's motion for summary judgment.[2]

**Standard of Review**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

---

[2] While plaintiff states she intends to ask the Court to refrain from ruling on defendant's motion for summary judgment until she conducts discovery, *see* Pl's. Resp. to Def's. Statement of Undisputed Facts in Supp. of Def's. Mot. Summ. J. n. 1 (docket entries 21, 24, & 27), she did not file a motion to stay or an affidavit stating what facts she expects further discovery would reveal as required by Fed.R.Civ.P. 56(f). *See Dulany v. Carnahan,* 132 F.3d 1234, 1238 (8th Cir.1997)(Rule 56(d) requires the filing of an affidavit showing what specific facts further discovery might unveil).  *See In re TMJ Litigation,* 113 F.3d 1484, 1490 (8th Cir.1997)( "If a party opposing a summary judgment motion does not seek shelter under Rule 56(f) or otherwise ask for a continuance, a District Court generally does not abuse its discretion in granting summary judgment...."). In response to the Court entering a Final Scheduling Order on June 30, 2011, defendant filed a motion to stay discovery pending the Court ruling on defendant's motion to dismiss/summary judgment. Plaintiff objects to a stay of discovery pending a ruling, stating defendant previously was apprised of the documents she would be requesting and providing those documents would not require substantial work for defendant. Those documents include the personnel files of the five male TMH leaders, copies of any letters of reprimand issued and disciplinary actions taken against the five male leaders, and Garrick's personnel file and payroll records.  *See* Pl's. Resp. in Opp. to Mot. Stay, Ex. 1.  The parties filed a joint motion for extension of the discovery and motions deadlines on July 22, 2011. *See* docket entry 41.

law." Fed.R.Civ.P. 56(c). As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Once the moving party has properly supported its motion for summary judgment, the non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The non-moving party may not rest on mere allegations or denials of her pleading but must "come forward with 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 587 (quoting Fed . R.Civ.P. 56(e)).

"[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v.. Affiliated FM Ins. Co.,* 49 F.3d 399, 401 (8th Cir.1995). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita,* 475 U.S. at 587 (citations omitted). "Although summary judgment is to be used sparingly in employment discrimination cases, it is appropriate where one party has failed to present evidence sufficient to create a jury question as to an essential element of its claim." *Arnold v. Nursing and Rehab. Ctr. At Good Shepherd, LLC,* 471 F.3d 843, 845-6 (8th Cir.2006)(internal citation omitted).

## Discussion

Garrick alleges the Army discriminated against her on the basis of gender when it demoted her from TMH Leader on September 22, 2009. She also claims the demotion was in retaliation for filing complaints with the EEO. Garrick alleges the Army discriminated against her on the basis of gender and retaliation when it disqualified her from the CPRP and removed her from federal service.

**Gender Discrimination Claims**

Because Garrick presents no evidence that directly points to the presence of a discriminatory motive, the Court will analyze her discrimination claims under the three-part framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1972). Under that framework, Garrick must establish a *prima facie* case of discrimination by showing that (1) she is a member of a protected class; (2) she met the legitimate expectations of her employer; (3) she suffered adverse employment action; and (4) similarly situated employees that were not members of her protected class were treated differently. *See Philip v. Ford Motor Co.,* 413 F.3d 766, 768 (8th Cir.2005). If Garrick makes a *prima facie* showing, the burden shifts to the Army to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Then, the burden shifts back to Garrick to present evidence that the stated reason for adverse action is pretext for gender discrimination. *Id.* "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133 (2000).

1. Demotion from TMH Team Leader

The Army argues Garrick cannot establish a *prima facie* case of gender discrimination when she was demoted from TMH Leader to TMH on September 22, 2009, because the evidence is undisputed that she was not meeting the legitimate expectations of her employer and there is no evidence that similarly situated employees not in the protected group were being treated differently. During her tenure as a TMH Leader, her supervisor, Harvest Lambert, verbally warned Garrick numerous times about her performance and also issued a written warning in July 2008. Lambert even pulled Garrick from the leader position for about a month because she was not following SOPs.

Lambert testified that in his opinion Garrick's performance did not improve after the written counseling and other discipline, and he recommended she be given a "poor or fair" rating for 2008-09. Lambert testified without dispute that then-supervisor Bass overruled him; Bass stated he was going to have a "big talk" with Garrick. Between June 2007 and April 2009, Garrick was cited 36 times for SOP violations, twice as many as any other leader. The Army also points to the results of survey Dunemn conducted of Garrick's team, which were overwhelmingly negative toward Garrick. Garrick complains about the way the survey was performed, including that Dunemn was present during the time of the survey, Dunemn did not tell her he was going to conduct the survey, and the questions were based on accusations made against Garrick. She points to Fowler's testimony that he told Dunemn later that the questions he asked on the survey were misleading and that Fowler could pose the questions to the same people and get different answers. Def's. Mem. in Support of Mot. Dismiss/Summ J., Ex. 3 at 224-25; Ex. 4 at 162. In spite of her complaints about how the survey was conducted, Garrick fails to present any evidence to suggest that the way the survey was performed was intended to discriminate against her. Further, Garrick cannot establish that similarly situated male TMH leaders were treated differently because she committed more than twice as many SOP violations than any other TMH leader (since June 2007).[3]

Even if she could establish a *prima facie* case of discrimination as to her demotion, Garrick cannot show the reasons proffered for her demotion were pretextual. The Army articulated legitimate non-discriminatory reasons for Garrick's demotion to TMH: (1) her performance problems as a leader, including a written counseling and citations by quality inspectors for 36 SOP violations, and

---

[3] In her response, Garrick said she need discovery on the five male TMH Leaders to compare the number of SOP violations they received during the period of July 14, 2008 - April 8, 2009. In reply, the Army submitted the SOP violation records of the team leaders under Dunemn from March 2007 to April 2009, *see* docket entry 34, Ex. 23, which corroborate Dunemn's testimony that Garrick had twice as many violations.

11

(2) Dunemn's perception that her continued refusal to accept responsibility for her SOP violations showed an unacceptable lack of leadership skills.

A plaintiff must do more than "raise doubts about the wisdom and fairness of the opinions of him held by his superiors and his fellow employees" to survive a motion for summary judgment. *Edmund v. MidAmerican Energy Co.*, 299 F.3d 679, 685 (8th Cir. 2002). The Court's purpose is not to sit as a "super-personnel department," assessing the fairness, correctness, or wisdom of the Army's decision but whether it was motivated by intentional discrimination. *Krenik v. County of Le Sueur,* 47 F.3d 953, 960 (8th Cir.1995). Because Garrick presents no evidence to discredit the proffered reason for her demotion and no evidence that gender was the reason behind her demotion, the Army is entitled to summary judgment in its favor.

2. Disqualification from the CPRP and Subsequent Removal

In Count II, Garrick claims the Army discriminated against her on the basis of gender when, in December 2009, it disqualified her from the CPRP and then removed her from her TMH position. As with Count I, Garrick cannot establish a *prima facie* case of gender discrimination because she was not meeting the legitimate expectations of her employer. As described above, Garrick had a long history of performance problems beginning in 2007 when she became a leader, including numerous SOP violations, accusations of rushing operations, a written counseling, and a demotion. On September 29, 2009, after she went back to her TMH non-leader position, Garrick threw a set of keys at her team leader Haynes, forcing him to block her throw with his clipboard. Seven employees, including Haynes, said Garrick threw the keys at him. Garrick does not deny she threw the keys but says tossing keys to each other was a practice of TMHs and TMH Leaders, that Haynes did not say

anything to her, did not characterize her throwing of the keys as a hostile act in a written statement he completed later that day, and did not report the incident to Chief Scott Levin.[4]

Further, Garrick has no evidence that similarly situated employees who are not members of the protected group were treated differently. Dunemn testified he knew of only one other employee who "actually physically threw something at another employee. [And t]hat individual, we did the same process, we started termination procedures and removal from [C]PRP." Def's. Mem. in Supp. Mot. to Dismiss/Summ. J., Ex. 3 at 122. Garrick argues that Dunemn did not recommend termination of two male employees who bumped into each other and argued with each other. She also complains that Dunemn did not recommend termination of a male employee who engaged "in threatening conduct to inflict bodily injury without bodily contact against another co-employee which consisted of the threat that if an employee did not leave the threatening employee's office, he would put his head into the wall . . ." Pl's. Mem. in Supp. of Resp. to Def's. Mot. Summ. J. at 55.

The Army argues, and the Court finds, that the incidents cited are not comparable to Garrick's throwing of the keys. In the bumping incident there is no evidence of intent by either employee to harm anyone as Garrick apparently attempted to do. The incident regarding a threat by one employee to another involved no bodily contact, and neither incident involved actions or threats to a person in a supervisory role; Garrick's actions were directed toward her team leader. *See Hervey v. County of Koochiching*, 527 F.3d 711, 720 (8th Cir. 2008)("[T]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances").

---

[4] She further alleges that Haynes decided to report the incident only when faced with a complaint from one of Garrick's co-workers for whom Garrick had written a statement in support of her claims against Haynes. *See* Mem. in Supp. of Pl's. Resp. to Mot. Summ. J. At 14.

Because Garrick engaged in an aggressive act toward her team leader after her demotion and had a long history of job performance issues, she cannot establish that she was meeting the legitimate expectations of her employer. Also, she cannot show that similarly situated males were treated differently than she was.

Even assuming Garrick could establish a *prima facie* case of gender discrimination as to her removal from the CPRP and from federal service, she cannot show that the Army's reasons for its actions were pretextual. Pursuant to Army Regulation 50-6, 2-8d, among the grounds for disqualification from the CPRP are: "Inappropriate attitude, conduct, or behavior." Specific factors to consider include: "(1) Negligence or delinquency in performance of duty. . . . (3) Poor attitude or lack of motivation. Poor attitude can include arrogance, inflexibility, suspiciousness, hostility, flippancy toward CPRP responsibilities, and extreme moods, or mood swings. (4) Aggressive/threatening behavior toward other individuals." Def's. Mem. of Law in Supp. Mot. Dismiss/Summ. J., Ex. 2. The Army disqualified Garrick in accordance with Army Regulation 50-6 because of negligence in the performance of her duties, lack of accountability, and aggressive behavior toward her team leader. *Id.*, Ex. 18. Garrick has no evidence that these reasons were pretextual and that the real reason for her disqualification/termination was her gender.[5]

It is undisputed that Garrick was negligent in the performance of her duties as evidenced by her many SOP violations. The evidence is clear that Dunemn believed Garrick was a poor leader based on her continued refusal to accept responsibility for infractions. Finally, the Army had reasonable cause to believe that Garrick committed an aggressive act toward her team leader. While

---

[5]Garrick argues that the penalty of removal from the CPRP exceeds the Pine Bluff Arsenal's Table of Penalties. The Army responds that Garrick's removal was based on the CPRP regulations, not the Arsenal's Table of Penalties. Further, the Army points out that a penalty under the Table can be exceeded based on factors such as whether the actions were directed at a supervisor. *See* Def's. Reply to Resp. to Mot to Dismss/Summ.J., Ex. 24. There is no dispute that Haynes was the Team Leader.

she maintains that she threw the keys underhanded to Haynes and not in a threatening or insubordinate manner, the Army had statements corroborating Haynes' version and had reason not to believe Garrick. *See McCullough v. Univ. of Arkansas for Med. Sciences*, 559 F.3d 855, 862 (8th Cir. 2009)("[t]he critical inquiry in discrimination cases . . . is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge").

**Retaliation Claims**

To establish a claim of retaliation, a plaintiff must show: (1) she engaged in protected activity; (2) a reasonable employee would have found her employer's retaliatory action materially adverse; and (3) the materially adverse action was causally linked to her protected activity. *Higgins v. Gonzales*, 481 F.3d 578, 589 (8th Cir. 2007). If a prima facie case is made, the burden of production shifts to the defendant to proffer a legitimate non-discriminatory reason for the adverse action. The burden then shifts back to the plaintiff to show that the defendant's reason is a pretext for discrimination. *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1074 (8th Cir. 2006).

1. Demotion from TMH Leader on September 22, 2009

On April 9, 2009, Garrick contacted a counselor at the EEO office of the Pine Bluff Arsenal, and during that conference designated Dunemn as a responsible management official. Garrick alleges that Dunemn became aware later that day that she had contacted the EEO. On April 13, 2009, Dunemn suspended Garrick from performing her CPRP duties. During their meeting on April 13, 2009, Garrick says Dunemn did not tell her he was going to demote her because he had not made his final decision and wanted to gather more information and do an investigation. Compl. at ¶ 11(b). On April 28, 2009, Dunemn notified the EEO counselor that he and Lt. Col. Johnston, the

commander of the PBCA, agreed that Garrick should be issued a letter of reprimand for failure to follow SOP. *Id.* at 13. Garrick had her final interview on April 29, 2009 with the EEO counselor, who told Garrick she had fifteen days to file a formal complaint. *Id.* at 14. On April 29, 2009, Garrick met with Dunemn who asked her to sign a letter of reprimand. Garrick signed the letter but included below her signature a statement that she did not concur with the letter. Dunemn rejected the letter as signed.

On May 11, 2009, Garrick filed a formal complaint of discrimination, alleging harassment and discrimination on the basis of gender. On May 14, 2009, Garrick again met with Dunemn, who asked her to sign a letter of reprimand as to the two SOP violations Garrick agreed she committed. Garrick told Dunemn she had already signed the letter with the disclaimer and she would not sign the letter without the disclaimer. Compl. at ¶¶ 18-19. On July 28, 2009, Garrick met with Dunemn, who proposed to demote Garrick from TMH Leader to TMH. He lifted her suspension from the CPRP and allowed her to perform her CPRP duties as a TMH while being paid as a TMH Leader position pending the outcome of the proposed demotion. *Id*. at 20.

On August 17, 2009, Garrick amended her May 11, 2009, formal EEO complaint to include Dunemn's decision to demote her. On September 22, 2009, Garrick received notice that Lowrey affirmed Dunemn's decision to demote her. On September 23, 2009, Garrick contacted the EEO counselor concerning the demotion and designated Lowrey and Dunemn as the responsible management officials. On October 20, 2009, Garrick filed a formal EEO complaint alleging that her demotion was in retaliation for her previous EEO activity.

The Army argues that Garrick cannot establish a causal connection between her protected activity and her demotion because there is no dispute that her supervisor intended to demote her, or at least take some disciplinary action against her, for poor performance prior to her EEO activity.

In *Clark County School Dist. v. Breeden*, 532 U.S. 268 (2001), the plaintiff complained that she was retaliated against when she was transferred to a less desirable position a month after she filed a Title VII discrimination complaint.  The Supreme Court held that the fact that the supervisor revealed she was contemplating the transfer prior to the plaintiff's filing of her EEOC charge was sufficient to demonstrate the absence of any causal connection between the protected activity and the transfer.  The Court held: "Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Id.* at 272.

The record here reflects that in March 2009, a month before Garrick first contacted the EEO counselor, Inspector McPherson told Dunemn that Garrick told her she should not be on Garrick's site to inspect Garrick's team.  On April 6, 2009, McPherson and Surveillance Branch Manager, Efurd, told Dunemn that Garrick had been cited for failing to wear protective clothing and other SOP violations.  Def's. Mem. of Law in Supp. of Mot. Dismiss/Summ. J., Ex. 3 at 105.  Dunemn responded to these two reports by asking Efurd to gather all surveillance inspector comments for Garrick during her career as Leader.  Upon learning of the large number of violations Garrick had accumulated, Dunemn met with McPherson and Efurd on April 7,.  Dunemn testified he believed, based on that meeting, that Garrick should be demoted.  *Id.*, Ex. 3 at 106; Ex. 4 at 136.  He said: "[W]e had already initiated our [disciplinary] actions prior to her ever going to see EEO."  *Id.*, Ex. 4 at 174.

Garrick argues that Dunemn did not make the final decision to demote her until after she went to the EEO.  The facts are clear, however, that he initiated the disciplinary investigation and contemplated demotion prior to her going to the EEO.  Further, after she initiated an informal EEO complaint, Dunemn offered to lower the level of discipline to a reprimand.  However, Garrick refused

to accept written responsibility for any of her SOP violations. The Court finds Garrick has presented no evidence from which to find a causal connection between her EEO activity and her demotion.

Even if she could establish a *prima facie* case of retaliation, Garrick cannot show that the reasons proffered for her demotion were pretexts for retaliation. She cannot show that the Army did not "in good faith believe that [she] was guilty of the conduct justifying [the adverse action]." *McCulluogh, supra*, 559 F.3d at 861-62. The record supports that Dunemn had good reason to believe Garrick had serious performance problems and that she lacked leadership skills based on her refusal to accept responsibility for her actions.

2. Disqualification from the CPRP and Subsequent Removal

Garrick contends her disqualification from the CPRP and removal from federal service was in retaliation for her EEO activity. Even assuming Garrick can establish a *prima facie* case of retaliation, the Court finds she fails to establish a genuine issue of material fact as to pretext. The Army had a reasonable belief that Garrick committed an aggressive act toward her team leader, based on multiple witness statements indicating she had thrown a set of keys at Haynes as hard as she could. She admits her throw was harder than Haynes was expecting,[6] that he blocked the throw with his clipboard, and that she stared at him after the throw. All this indicates it was a hostile act. Further, the Army had ample proof that Garrick was negligent in her duties as evidenced by her 36 SOP violations in her two years as a TMH leader. As described above, there is no dispute that Dunemn perceived Garrick to be a poor leader based on her refusal to take responsibility for her infractions.

---

[6]Garrick maintains she threw the keys to Haynes underhanded but threw them harder than Haynes expected because she was trying to make sure the keys made it to Haynes, who was about 30 feet away. Pl's. Resp. to Def's. Statement of Facts, ¶34.

Because Garrick cannot show that the proffered reasons for her disqualification from the CPRP and subsequent removal were a pretext for retaliation, the Court finds the Army is entitled to summary judgment.

## Conclusion

IT IS THEREFORE ORDERED that defendant's motion for summary judgment [docket entry 7] is hereby granted.[7]  Judgment will be entered accordingly.

DATED this 29th day of July, 2011.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE

---

[7] Defendant's motions to stay [docket entries 38 and 41] are moot.